UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

      Plaintiff-Respondent,

v.

BOBBY W. FERGUSON (D-2),

      Defendant-Petitioner.

_____/

Case No. 10-20403

Honorable Nancy G. Edmunds

## ORDER DENYING PETITIONER'S MOTION UNDER 28 U.S.C. § 2255 TO VACATE, SET ASIDE, OR CORRECT SENTENCE [585]

## I.    BACKGROUND

On March 11, 2013, a jury convicted Petitioner–Defendant Bobby W. Ferguson of nine of the eleven counts in which he was charged:  one count of RICO conspiracy, 18 U.S.C. § 1962(d); six counts of extortion, 18 U.S.C. § 1951; one count of attempted extortion, 18 U.S.C. § 1951; and one count of bribery, 18 U.S.C. § 666(a).  (Dkt. # 277). The Court sentenced Defendant to be imprisoned for a term of 252 months.  (Dkt. # 519). The Sixth Circuit affirmed Defendant's convictions, and the Supreme Court denied his petition for certiorari.  (Dkt. # 570; 575).  Defendant timely filed the instant *pro se* motion to vacate his sentence under 28 U.S.C. § 2255.  (Dkt. # 585).  The Government has filed a response, and Defendant has filed a reply as well as exhibits.  (Dkt. # 594; 596; 597). For the reasons set forth below, the Court DENIES Defendant's motion.

## II.    ANALYSIS

Under 28 U.S.C. § 2255, "[a] prisoner in custody under sentence of a [federal] court . . . claiming the right to be released . . . may move the court which imposed the sentence

to vacate, set aside or correct the sentence."  To prevail on a Section 2255 motion, the petitioner must allege:  "(1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid."  *Mallett v. United States*, 334 F.3d 491, 496-97 (6th Cir. 2003) (internal quotation marks omitted).  Section 2255 motions filed *pro se* are liberally construed.  *See Ratliff v. United States*, 999 F.2d 1023, 1026 (6th Cir. 1993).

Defendant argues that the Court should vacate his sentence on the basis of improper jury instructions, ineffective assistance of counsel, prosecutorial misconduct, and insufficiency of the evidence.

### A. Procedural Default

The Court first notes that Defendant procedurally defaulted most of his claims by not raising them on direct appeal.  "An application under § 2255 is an extraordinary remedy and should not be considered a substitute for direct appeal."  *Capaldi v. Pontesso*, 135 F.3d 1122, 1124 (6th Cir. 1998).  "In the case where the defendant has failed to assert his claims on direct appeal and thus has procedurally defaulted, in order to raise them in a § 2255 motion he also must show either that (1) he had good cause for his failure to raise such arguments and [actual] prejudice . . . , or (2) he is actually innocent."  *Regalado v. United States*, 334 F.3d 520, 528 (6th Cir. 2003) (citing *Bousley v. United States*, 523 U.S. 614, 622 (1998)).  Ineffective assistance of counsel may in some cases show cause for the default and actual prejudice from it.  *See Hall v. Vasbinder*, 563 F.3d 222, 236-37.  In order to show actual prejudice, the defendant must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions."  *United*

*States v. Frady*, 456 U.S. 152, 170 (1982) (emphasis in original). To show actual innocence, the defendant must show that "it is more likely than not that no reasonable juror would have convicted him." *Bousley*, 523 U.S. at 623 (internal quotation marks and citations omitted). The hurdle a defendant faces in excusing his procedural default is intentionally high "for respect for the finality of judgments demands that collateral attack generally not be allowed to do service for an appeal." *Peveler v. United States*, 269 F.3d 693, 700 (6th Cir. 2001) (quoting *Elzy v. United States*, 205 F.3d 882, 884 (6th Cir. 2000)) (internal quotation marks omitted); *see Frady*, 456 U.S. at 166 ("[T]o obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on direct appeal.").

By not raising them on direct appeal, Defendant procedurally defaulted his improper jury instructions claim, prosecutorial misconduct claim, insufficiency of the evidence claim, and sentencing guidelines claim. Defendant presents nothing in his Section 2255 motion that would excuse his procedural default. Even if the alleged deficiencies in Defense Counsel's performance could show cause for the default, Defendant falls far short of showing that the alleged errors "worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions," as discussed below. *Frady*, 456 U.S. at 170. Further, Defendant cannot show actual innocence. As this Court has previously discussed at length, the evidence at trial weighed heavily in support of the verdicts of guilt against Defendant. *See* Dkt. # 462. Defendant's claims are therefore barred, and even if they were not barred, these claims would fail on the merits, as discussed below.

### B. Jury Instructions

Defendant takes issue with three aspects of the Court's jury instructions. The Court addresses each argument in turn.

First, Defendant argues that the instruction related to "Extortion through the Wrongful Use of Economic Harm" was too expansive and vague. Specifically, he takes issue with the following language: "Fear exists if the person experiences anxiety or concern over expected business loss, financial or job security, or the ability to keep work or obtain future work." (Dkt. # 406, Pg ID 14423). The Government notes that this instruction is based on the Seventh Circuit Pattern Criminal Jury Instruction to 18 U.S.C. § 1951 and argues that there is nothing overly expansive or vague in this instruction.

The Court finds that this instruction was not overly expansive or vague. Defendant offers no legal authority, and the Court is not aware of any, in support of Defendant's argument to the contrary. Defendant suggests that the Court did not sufficiently differentiate extortion from bribery in its instruction, but he makes no developed argument in support of his position. Contrary to Defendant's assertion, the Court specifically instructed the jury that "[e]xtortion through use of fear of economic harm is the obtaining of money or property from another person with that person's consent *when the consent is brought about through the wrongful use of fear of economic harm to the person or his business unless the person turns over the money or property*" — sufficiently differentiating extortion through a definition that excludes a case of bribery where the victim faces no increased risk if he does not pay, but rather, stands only to improve his lot by paying the defendant. *See id.* (emphasis added); *United States v. Collins*, 78 F.3d 1021, 1030 (6th Cir. 1996).

Second, Defendant takes issue with the instruction on the definition of "corrupt intent" as it pertains to bribery in violation of 18 U.S.C. § 666(a), though Defendant's argument is not clear. The Government notes that the Court's instruction was based on the Seventh Circuit Pattern Criminal Jury Instruction to 18 U.S.C. § 666(a)(1)(B) and Modern Federal Jury Instructions Criminal 27-A-9 (2011). The Court instructed the jury as follows.

> In considering the third element, you should determine whether it was the public official's intent, at least in part, to be influenced or rewarded. You need not determine the subsequent actions of the public official or the business of his office. In other words, the government does not have to prove that the public official received the bribe or that the bribe actually influenced the business of his office. It is not even necessary that the public official had the authority to perform the acts sought. Also, if you find that the public official accepted something with the intent to be rewarded for a decision already made, the third element is satisfied, even though the payment was accepted or solicited after the decision had been made. An illegal bribe may be paid with the intent to influence a general course of conduct. It is not necessary for the government to link any particular payment to any particular action undertaken by the defendant.

(Dkt. # 406, Pg ID 14428-29).

The Court finds that this instruction accords with Sixth Circuit law and rejects Defendant's challenge. As the Sixth Circuit has explained, by its terms, 18 U.S.C. § 666 does not require the Government to prove that the public official "contemplated a specific act when he received the bribe." *United States v. Abbey*, 560 F.3d 513, 520 (6th Cir. 2009). Rather, a defendant violates the statute if he "'corruptly' accepts (or gives, or conspires to give) something of value intending to be influenced or rewarded in connection with" some transaction involving property or services worth at least $5,000.00. *Id.* at 521.

Lastly, Defendant argues that the jury instructions did not comport with the Supreme Court's intervening decision in *McDonnell v. United States*, 136 S. Ct. 2355 (2016). In that case, the Supreme Court narrowed the definition of "official act" under the federal bribery

5

statute, 18 U.S.C. § 201(a)(3), which the parties in that case also used to define "official action" under the Hobbs Act, 18 U.S.C. § 1951(b)(2). *Id.* at 2365, 2368. McDonnell challenged the definition of "official action" in the jury instructions on the ground that it encompassed virtually all of a public official's activities, no matter how minor. *Id.* at 2367. In his view, an "official act" had to intend to or in fact influence a specific official decision, "such as awarding a contract." *Id.* at 2366 (citation omitted). The Government, on the other hand, argued that arranging a meeting, calling another public official, and/or hosting an event qualified as an "official act." *Id.* at 2367. The Court held that arranging a meeting, talking to another official, or organizing an event (or agreeing to do so) could not, standing alone, qualify as an "official act." *Id.* at 2372.

> [A]n "official act" is a decision or action on a "question, matter, cause, suit, proceeding or controversy." The "question, matter, cause, suit, proceeding or controversy" must involve a formal exercise of governmental power that is similar in nature to a lawsuit before a court, a determination before an agency, or a hearing before a committee. It must also be something specified and focused that is "pending" or "may by law be brought" before a public official. To qualify as an "official act," the public official must make a decision or take an action on that "question, matter, cause, suit, proceeding or controversy," or agree to do so. That decision or action may include using his official position to exert pressure on another official to perform an "official act," or to advise another official, knowing or intending that such advice will form the basis for an "official act" by another official.

*Id.* at 2371-72.

Defendant argues that his convictions must be vacated because the jury was improperly instructed on the meaning of "official act." The Court instructed the jury as follows.

> Extortion under color of official right occurs when a public official, or someone acting with the public official, receives money or property to which the public official is not entitled, knowing or believing that the money or

6

property is being given to the public official in return for the taking, withholding, or otherwise influencing of an official act.

Although the official or someone acting with him must obtain the money or property, the government does not have to prove that the public official or person acting with him asked for or first suggested the giving of money or property. In addition, the payment can occur either before or after the expected official action.

While [the] official or someone acting on behalf of the public official must obtain the money or property in return for the expectation of an official action, the government does not have to prove that the official actually took or even intended to take that action, or that the official was in a position to take the action in return for which payment was made, or that the official would have acted differently or have taken the same action even without payment.

The government does not have to prove an explicit promise to perform a particular act made at the time of the payment. Rather, it is sufficient if the public official understands that he is expected as a result of the payment to exercise particular kinds of influence as specific opportunities arise.

The public official need not have any intention of actually exerting his influence on the payor's behalf. The question is whether the official or someone with whom he was acting obtained money through implicit or explicit promises that the public official would use his public influence in return.

(Dkt. # 406, Pg ID 14421-22).

Although the Court did not include a specific definition of "official act" in the jury instructions, Defendant's convictions stand because, even assuming *arguendo* that the Court erred, any *McDonnell* error was harmless. *See Neder v. United States*, 527 U.S. 1, 16 (1999) (explaining that the test for determining whether a constitutional error is harmless is whether it appears beyond a reasonable doubt that the error did not contribute to the verdict obtained). On the jury verdict form, the jury specified that it had found beyond a reasonable doubt that all of Defendant's extortion convictions rested on a wrongful fear of economic harm theory (either exclusively or in addition to also resting on a color of official right theory). *See* Dkt. # 277. Defendant's extortion convictions stand as long as there was

7

sufficient evidence to prove either the fear of economic harm theory or the color of official right theory. *See United States v. Upshaw*, 114 F. App'x 692, 709 (6th Cir. 2004), *judgment vacated on other grounds sub nom. Rice v. United States*, 545 U.S. 1136 (2005). *McDonnell* is inapplicable to the wrongful fear of economic harm theory. Accordingly, the extortion and attempted extortion convictions stand.

Regarding Defendant's bribery conviction, *McDonnell* does not apply to 18 U.S.C. § 666, which does not include the term "official act" or any similar term. *See* 18 U.S.C. § 666 (prohibiting the soliciting or giving anything of value from or to any person, intending to be influenced or influence "in connection with any business, transaction, or series of transactions" of an organization, government, or agency); *United States v. Boyland*, 862 F.3d 279, 291 (2d Cir. 2017) (finding that 18 U.S.C. § 666 is "more expansive than § 201," and that the *McDonnell* standard does not apply to counts of bribery under 18 U.S.C. § 666); *United States v. Maggio*, 862 F.3d 642, 646 n.8 (8th Cir. 2017), *cert. denied,* 138 S. Ct. 437 (2017), *reh'g denied,* No. 17-6272, 2018 WL 311962 (Jan. 8, 2018) ("*McDonnell* was about what conduct rises to the level of an "official act" within the scope of a different bribery statute. *McDonnell* had nothing to do with § 666 . . . ."). In any event, Defendant never contested that approving, awarding, or withholding a Department of Water and Sewerage for the City of Detroit ("DWSD") contract qualifies as an "official act." At trial, these were the only official acts at issue, and these acts satisfy *McDonnell*'s narrower definition of "official act." *See United States v. Repak*, 852 F.3d 230, 253 (3d Cir. 2017) (finding that a decision to award a contract to develop city infrastructure is a formal exercise of governmental power that is similar in nature to a lawsuit, administrative determination, or hearing).

## C. Ineffective Assistance of Counsel

Defendant argues that Defense Counsel was ineffective because Defense Counsel (1) failed to challenge the accuracy of the case agents' testimony and stipulated to inaccurate interpretations of text messages without Defendant's consent; (2) failed to explain hearsay objections to the jury; (3) failed to request additional limiting instructions regarding fear evidence; (4) failed to reveal prejudicial inaccuracies in Government's Exhibit LS3-36; (5) failed to object to the Government's improper closing argument; (6) failed to enforce Defendant's right to confront witnesses against him; and (7) failed to raise sentencing errors on appeal. The Court addresses each argument in turn.

Under the Sixth Amendment, a defendant has a right to "have the Assistance of Counsel for his defense." U.S. Const. Amend. VI. A defendant has a right to "reasonably effective assistance of counsel." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the Supreme Court articulated a two-prong test to show ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a breakdown of the adversary process that renders the result unreliable.

*Id.* "There is a strong presumption that legal counsel is competent. *United States v. Osterbrock*, 891 F.2d 1216, 1220 (6th Cir. 1989). In addition, a "reviewing court must give a highly deferential scrutiny to counsel's performance." *Ward v. United States*, 995 F.2d 1317, 1321 (6th Cir. 1993). "The reasonableness of counsel's performance is to be

evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances." *Kimmelman v. Morrison*, 477 U.S. 365, 384 (1986). "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. The defendant bears the burden of showing that counsel was so deficient and that prejudice resulted from counsel's errors. *Id.* at 686-87.

### 1. Failure to Challenge Accuracy of Case Agents' Testimony

Defendant first argues that Defense Counsel was ineffective because he failed to challenge the accuracy of the case agents' testimony and stipulated to inaccurate interpretations of text messages without Defendant's consent. While Defendant asserts that Defense Counsel allowed the case agents to lie, Defendant fails to identify any specific inaccuracy in the case agents' testimony that went unchallenged. Indeed, as previously noted by this Court and the Sixth Circuit, Defense Counsel did object to much of the case agents' testimony. *See* Dkt. # 570, Pg ID 17093. Unfortunately for Defendant, those objections were rejected by this Court and by the Sixth Circuit on appeal. Additionally, Defendant takes issue with Defense Counsel stipulating before trial that the case agents could, relying on surrounding text messages, clarify terms such as nicknames, abbreviations, acronyms, etc. However, Defendant does not identify any inaccuracy in the interpretation of the text messages that Defense Counsel stipulated to, or explain how any stipulation was in any way prejudicial. The Court concludes that Defendant has not met his burden of showing that Defense Counsel's performance was constitutionally deficient with regards to the case agents' testimony.

### 2. Failure to Explain Hearsay Objections to the Jury

Defendant argues that Defense Counsel was ineffective because he failed to explain in detail to the jury why Defense Counsel objected to the fearful state of mind evidence, arguing that the statements were inadmissible hearsay. The Government correctly notes that such argument would have been improper. Defense Counsel objected several times to witnesses testifying about what other people had told them as evidence that the witnesses feared the Defendants in this case. This Court permitted the testimony and gave limiting instructions to the jury where appropriate. Defendant's appellate attorney challenged these rulings, but the Sixth Circuit rejected Defendant's arguments. The Court concludes that Defense Counsel's performance was reasonable in this regard.

### 3. Failure to Request Additional Limiting Instructions Regarding Fear Evidence

Defendant argues that Defense Counsel was ineffective because he failed to request that the Court give additional limiting instructions to the jury regarding the testimony about what other people had told witnesses, which the Government presented as evidence that the witnesses feared Defendants. However, Defendant fails to identify any instance where a request for any additional limiting instruction might have been appropriate. The Court concludes that Defendant has not met his burden of showing that Defense Counsel's performance was constitutionally deficient with regards to requesting limiting instructions.

As previously discussed by this Court and the Sixth Circuit, this Court properly distinguished between hearsay and nonhearsay uses of challenged testimony by examining its proposed use and giving a limiting instruction to the jury where appropriate. *Compare, e.g.,* Dkt. # 352, Pg ID 8097-98 (ruled not hearsay and limiting instruction provided to jury)

*and* Dkt. # 370, Pg ID 10046 (ruled not hearsay and limiting instruction provided to jury), *with* Dkt. # 372, Pg ID 10291-93 (ruled hearsay that fell within Fed. R. Evid. 803(3), the state of mind exception to the hearsay rule, and no limiting instruction provided). *See also* Dkt. # 379, Pg ID 11189-90 (explained distinction and instructed witness not to offer hearsay; rather, if prosecutor asked what somebody else said, let the judge rule on it before volunteering it). Defendant has not met his burden of showing that, but for any error on Defense Counsel's part in failing to request additional limiting instructions, the result of the trial would have been different.

### 4. Failure to Reveal Prejudicial Inaccuracies in Government's Exhibit LS3-36

Defendant argues that Defense Counsel was ineffective because he failed to reveal prejudicial inaccuracies in Exhibit LS3-36. Government's Exhibit LS3-36 contains a chart representing the rankings for the bid proposals received by DWSD for Contract CM 2014, an eastside water main contract. *See* Dkt. # 597, Pg ID 17349. Defense Counsel objected to "FEI" (Ferguson Enterprises, Inc.) appearing next to "Lakeshore" on the chart because subcontractor FEI was not a part of the Lakeshore Engineering Services ("Lakeshore") bid. Defense Counsel pointed out that subcontractor E & T Trucking was a part of the Lakeshore bid, not FEI, and argued that the chart was misleading. *See* Dkt. # 359, Pg ID 9057-58. The Court overruled the objection and told Defense Counsel that he could cross examine on that issue. Through cross examination, Defense Counsel did in fact point out that FEI was not a subcontractor on the Lakeshore bid. *See* Dkt. # 360, Pg ID 9146-47; Dkt. # 361, Pg ID 9269. The Court concludes that Defense Counsel's performance was reasonable with regards to any inaccuracy in Government's Exhibit LS3-36.

The evidence at trial showed that Defendant introduced Lakeshore to E & T Trucking; that E & T Trucking was a Ferguson affiliated company; that Lakeshore's bid proposal misrepresented FEI's work experience as that of E & T Trucking; and that Defendant received over $4 million from the award of Contract CM 2014 to Lakeshore. *See* Dkt. # 352, Pg ID 8170-73; Dkt. # 357, Pg ID 8772-77; Gov't's Exh. BFF-31; Dkt. # 367, Pg ID 9643-44. Given this evidence, Defendant cannot show that, but for any error on Defense Counsel's part regarding Government's Exhibit LS3-36, the result of the trial would have been different.

### 5. Failure to Object to the Government's Improper Closing Argument

Defendant argues that Defense Counsel was ineffective because he failed to object at various points during the Government's closing argument. The Government responds that Defense Counsel challenged the Government's arguments in Defense's closing arguments.

Specifically, Defendant argues that Defense Counsel failed to challenge the following portions of the Government's closing argument:

- If you wanted a city contract, you had to pay. If you didn't pay, you didn't get a contract, and if you had a contract, it got canceled. It didn't matter that your bid was $1.6 million lower for a water meter contract. . . . Now, it may not have cost the defendants anything, ladies and gentlemen, but it cost the citizens of Detroit and the rate payers of southeast Michigan. Just on Contract CM-2014, the water main contract, Ferguson's team was $1.6 million higher . . . . (Dkt. # 406, Pg ID 14452-53).

- On Contract 849, Ferguson was paid $1.7 million for no work. *Id.* at Pg ID 14453.

- And as the Civic Fund was winding down, Bobby Ferguson put $75,000 in it. This is when the Civic Fund is about to be no more. Was he giving money to charity, to help the community? I suggest that he was simply

sharing $75,000 of the spoils of Kilpatrick Incorporated with a coconspirator. *Id.* at Pg ID 14461.

- But I want to talk about a company called Lakeshore, Lakeshore Engineering, one of the companies that was extorted. . . . They paid him a million dollars initially. That number grew. They paid him a million dollars on that 849 to do nothing, absolutely nothing, and then there were change orders that had to happen on 849. Ferguson demanded to be paid on those change orders five percent, so he got another $375,000, again, for nothing. Why? Ten and five. Lakeshore was afraid. . . . Look at $1.7 million on 849 for nothing, including the $25,000 cash that they had to hustle up at the last minute. Why in the world would they pay all that money if they weren't afraid? *Id.* at Pg ID 14469, 14473, 14477.

- Now, if you're wondering whether Mr. Hardiman and Mr. Rachmale were really afraid, were they really in fear of economic harm? Well, they testified that they were. If you have any question, look at the money that they spent giving to Ferguson. Look at $75,000 for nothing on the asbestos contract. *Id.* at Pg ID 14476.

- Let's talk about a contract called 1361. It's a $10 million sewer contract. Lakeshore won this contract fair and square. . . . Ten and five. Ten and five. $10 million contract they lost with no Ferguson, 1361, and the $5 million contract they lost that they didn't have Ferguson on, that was 1387. Lakeshore learned the lesson of Kilpatrick Incorporated, "No deal without me. . . . Why did Inland get the work from 1361? Because they had agreed to put Ferguson on that contract, and they were extorted, and I'll talk about that in a sec. *Id.* at Pg ID 14469, 14471-72.

- Well, [Inland Waters] got a contract called 1368. That was a big contract, $50 million contract, but they got that contract under Mayor Archer, but it still hadn't been -- and the water board, by the way, had approved it, but it still hadn't been signed off by the mayor's office when Kwame Kilpatrick came in 2002. Tony Soave came to find out that Kwame Kilpatrick was actually holding onto this contract, and Tony Soave was getting worried. *Id.* at Pg ID 14480-81.

- [Walbridge Aldringer was] bidding on a project called Baby Creek/Patton Park. It was a $75 million sewer project with a $10 million addition to build a recreation center called Patton Park, and the bids had been opened and Walbridge was neck and neck with another company called Walsh. . . . [A]t the time, Bernard Parker, III was working for Walbridge, so they told him, "Go find out what's going to happen with this contract." So Bernard Parker III testified he went and met with Derrick Miller. Derrick Miller gave the order, no deal without the order, "You got to put Bobby on this contract."

Bernard Parker then brought the news back to Walbridge and said, "We got to put Bobby on this contract." They didn't need Bobby on that contract, but they were worried about losing it. *Id.* at Pg ID 14484-85.

- One more contract involving Walbridge I want to mention. You heard about this Oakwood Pump Station contract, another huge contract. This is a $140 million contract. Walbridge tried for it, but they didn't get it. What's the difference? They didn't agree to Ferguson's demands. Ferguson wanted 30 percent of the contract, but he didn't want to take any of the risk. He didn't want to put up a bond equal to what he wanted. Ferguson even got the deadline for the bids postponed so he could try to extort this 30 percent from Walbridge. Walbridge didn't cave in and Walbridge didn't win that contract. *Id.* at Pg ID 14486.

- Now, let's review this pattern because what you've seen in this case is an absolute pattern that you can't deny, and that is the pattern of "No deal without me." 1361, contract with Lakeshore, no Ferguson. Contract canceled. 1368, held by the mayor, that's Inland's contract, until Ferguson was added, then the contract was let go. Amendment Number 4, held by the mayor until Ferguson was paid. 2014, DLZ, they don't have Ferguson on their team. They get their Detroit-headquartered status pulled for no reason. They lose the contract, and the city loses 1.6 million. Baby Creek, Walbridge, at the last second adds Ferguson, they get the contract. *Id.* at Pg ID 14500-01.

After reviewing the arguments and the record, the Court finds that this was proper argument on the Government's part, and that Defense Counsel adequately challenged each of the above points in their closing arguments. Defense Counsel challenged the Government's theory of the case and presented their own theory, arguing that Defendant did real work for the City of Detroit that nobody else wanted to do; that he did the work well; and that he was a real minority-owned, Detroit-based contractor. *See, e.g.*, Dkt. # 407, Pg ID 14519; Dkt. # 408, Pg ID 14699-700, 14728-30. Defense Counsel directly challenged the credibility of various Government witnesses. *See, e.g.*, Dkt. # 408, Pg ID 14683-84, 14694-98. Defense Counsel also challenged the evidence that the Government presented for each one of the charges against Defendant.

For example, regarding Contract CM 2014, Defense Counsel argued that a higher bidder could legitimately win a city contract where a lower bidder was not a Detroit-based business and therefore lacked the equalization credits that Defendant's companies received. *See* Dkt. # 407, Pg ID 14519-20. Defense Counsel also argued that DWSD was concerned that DLZ, a subcontractor on a rival bid, was not based in Detroit, and that this concern emanated from within DWSD and had nothing to do with Defendants. *See* Dkt. # 408, Pg ID 14675. Defense Counsel further argued that E&T Trucking, a subcontractor on the winning bid, was not a proxy for Defendant's company, but rather, a real example of Defendant mentoring another company; and that Defendant's company was not a subcontractor on the winning bid. *See id.* at Pg ID 14676-77.

Regarding Lakeshore more generally, Defense Counsel argued that Lakeshore was never in fear of economic harm and challenged Avinash Rachmale and Tom Hardiman's credibility. *See, e.g.*, Dkt. # 407, Pg ID 14524; Dkt. # 408, Pg ID 14683-84.

Regarding Contract CS 1368, Defense Counsel argued that Kwame Kilpatrick did not hold on to the contract. Rather, they argued that he was doing his due diligence as a new mayor and had other pressing matters to attend to at the time (Dkt. # 407, Pg ID 14525-26); that he was looking to eliminate pass-through companies that were minority fronts (*Id.*); that the contract was not delayed (*Id.* at Pg ID 14536; Dkt. # 408, Pg ID 146701); and that the subcontractor that Inland Waters Pollution Control, Inc. ("Inland") was originally bidding with and eventually replaced with Defendant's company, Charlie Williams, was just a pass-through minority front (Dkt. # 408, Pg ID 14699).

Regarding Contract 1361 (worth $10 million) and Contract 1387 (worth $5 million), Defense Counsel argued that Lakeshore lost these contracts, not because Lakeshore

refused to work with Defendant, but rather, because DWSD no longer saw a need for these contracts (*Id.* at Pg ID 14687); because Lakeshore had no experience with city contracts at the time (*Id.* at Pg ID 14682); and because DWSD was concerned that Lakeshore had engaged in intentional lowballing in their proposals (*Id.* at Pg ID 14687).  Defense Counsel also argued that Defendant would not have wanted to sabotage Contract 1387 because Defendant's company, Xcel, also lost that contract.  *Id.* at Pg ID 14688.

Regarding Contract DWS 849, Defense Counsel argued that the $1.7 million Defendant received were not the proceeds of extortion for no work, but rather,  represented a legitimate settlement of a contract dispute between Defendant and other subcontractors on the bid.  Defense Counsel argued that Defendant's company, FEI, was listed as a subcontractor on Lakeshore's winning bid, which benefitted from FEI's Detroit-based credits; that the other subcontractors later tried to push Defendant out of a contract he had helped to win; and that Defendant had to insist on a share of the profits because his work was being taken from him.  *Id.* at Pg ID 14690-94.

Regarding Contract PC 748, Defense Counsel challenged Government witness Bernard Parker, III's credibility and argued that Walbridge Aldringer Company ("Walbridge") was not in fear of economic harm.  *Id.* at Pg ID 14702-04, 14707.

Regarding Contract PC 755, Defense Counsel argued that there was no evidence to support the charge and again challenged Parker's credibility.  *Id.* at Pg ID 14725.

Lastly, regarding the $75,000 from Defendant to the Civic Fund, Defense Counsel argued that this was a proper contribution to the Civic Fund; that it would be illogical for Defendant to contribute $75,000 to the Civic Fund to benefit Kwame Kilpatrick when

Defendant could have just given him the money directly; and that the bulk of the Civic Fund money was properly spent. *Id.* at Pg ID 14725.

The Court concludes that Defense Counsel's performance was reasonable. Additionally, the Court instructed the jury about what was and was not evidence, adding that "[t]he lawyers' statements and arguments are not evidence." (Dkt. # 406, Pg ID 14412). This instruction would have lessened the impact of any improper remark during the Government's closing argument because the jury is presumed to follow all of the Court's instructions. *See Hall v. Vasbinder*, 563 F.3d 222, 238 (6th Cir. 2009). Defendant has not shown that, but for any error on Defense Counsel's part during closing arguments, the result of the trial would have been different.

### 6. Failure to Enforce Defendant's Right to Confront Witnesses Against Him

Defendant argues that Defense Counsel was ineffective because he failed to enforce Defendant's right to confront witnesses against him. Defendant again complains that certain witnesses were permitted to testify about what other people had told them as evidence that the witnesses feared the Defendants in this case. Specifically, Defendant notes that (1) Kathleen McCann, former Senior Vice President of Soave Enterprises, testified about what she heard from Dennis Oszust, a project manager for Inland, regarding Contract CS 1368 and Amendment Four to Contract CS 1368; (2) Bernard Parker, III, former Director of Business Development for Walbridge, testified about what he heard from Scott Penrod, a Walbridge Vice President, regarding Contract PC 748; (3) Parker also testified about what he heard from Ron Hausmann, another Walbridge executive, regarding Contract PC 755; and (4) Thomas Hardiman, a former Lakeshore executive, testified about what he heard from Angelo D'Alessandro, a representative of subcontractors Lanzo Lining

18

and DCG, regarding Contract DWS 849. Defendant takes issue with Defense Counsel's decision not to call or subpoena Oszust, Penrod, Hausmann, or D'Alessandro, relying instead on the cross examinations of McCann, Parker, and Hardiman.

The Sixth Amendment's Confrontation Clause "prohibits the introduction of testimonial statements by a nontestifying witness, unless the witness is unavailable to testify, and the defendant had a prior opportunity for cross-examination." *Ohio v. Clark*, 135 S. Ct. 2173, 2179 (2015) (internal quotation marks and citation omitted). Statements are testimonial when the primary purpose of the conversation was to create an out-of-court substitute for trial testimony. *Id.* at 2180. If this was not the primary purpose of a statement, then its admissibility is the concern of the rules of evidence, not the Confrontation Clause. *Id.* Statements made to persons other than law enforcement officers are much less likely to be testimonial than statements made to law enforcement officers. *Id.* at 2181.

Regarding Contract CS 1368 and Amendment Four to Contract CS 1368, McCann testified that Oszust would have been primarily responsible for putting together Inland's bid. (Dkt. # 372, Pg ID 10281). McCann also testified that Oszust and his team had a number of conversations with Insituform and Defendant about how to fit Defendant into this project, and that she also had meetings with Insituform and Defendant about this. *Id.* at Pg ID 10309, 10312. McCann further testified regarding two e-mails from Oszust to her indicating that Amendment Four to Contract CS 1368 was being held up by Kwame Kilpatrick and his administration until Ferguson Enterprises was satisfied. *See id.* at Pg ID 10325-27; Gov't's Exh. IN1-47; Gov't's Exh. IN1-50. Defendant correctly notes that Defense Counsel cross examined McCann. *See* Dkt. # 372, Pg ID 10332-56; Dkt. # 373, Pg ID 10362-10407. McCann's testimony was confirmed by e-mail exhibits as well as testimony from Anthony

Soave (Inland's owner), Derrick Miller (Kwame Kilpatrick's Chief Administrative Officer at the time), and Bernard Parker, III (Insituform's business development manager who was contracting with Inland to provide sewer liners at the time). *See, e.g.*, Gov't's Exh. IN1-47; Gov't's Exh. IN1-50; Dkt. # 370, Pg ID 10047-49; Dkt. # 386, Pg ID 12204-17; Dkt. # 372, Pg ID 10325-31; Dkt. # 379, Pg ID 11153-57.

Regarding Contract PC 748, Parker testified, based on a meeting he had with Penrod and Hausmann, that Penrod and Hausmann decided to include Defendant in Walbridge's bid for this contract because they were worried that Walbridge would not win the bid otherwise and because they hoped that including Defendant would improve Walbridge's chances. (Dkt. # 379, Pg ID 11193). The Court permitted this testimony over objection, and on appeal, the Sixth Circuit found that this testimony was admissible "under the *Williams-Collins* rule because Parker heard [these statements], and they would have tended to produce fear of economic harm." (Dkt. # 570, Pg ID 17105). Defendant correctly notes that Defense Counsel cross examined Parker, and they did so at length. *See* Dkt. # 379, Pg ID 11245-79; Dkt. # 380, Pg ID 11290-409. Defense Counsel also vigorously attacked Parker's credibility during closing argument, as discussed above. Parker's testimony regarding Contract PC 748 was confirmed by testimony from Derrick Miller, text messages between Defendant and Miller, and a one-page handwritten contract (signed by Penrod) providing that if Walbridge were awarded the contract, Walbridge would subcontract $2.73 million in site work to Defendant, as well as the $10 million provisionary allowance to improve the Patton Park recreational facility. *See, e.g.*, Dkt. # 386, Pg ID12237-56; Gov't's Exh. WA1-8; Gov't's Exh. WA1-14.

Regarding Contract PC 755, Parker testified that he attended a meeting with Hausmann and Defendant to discuss the Oakwood project. Parker testified that Hausmann reiterated that Defendant would have to be responsible for 30 to 35 percent of the risk if he wanted 30 to 35 percent of the profits on this contract. Parker testified that Defendant became angry, and that they were not able to reach a deal. *See* Dkt. # 379, Pg ID 11212-13. Parker and Agent Robert Beeckman both testified regarding a meeting at the Manoogian Mansion, scheduled at Defendant's behest, between John Rakolta, a top Walbridge executive, and Kwame Kilpatrick during the time of the bidding for this contract. *See id.* at Pg ID 11213-15; Dkt. # 390, Pg ID 12822-23; Gov't's Exh. WA2-1A. And again, Defense Counsel cross examined Parker and vigorously attacked his credibility.

Regarding Contract DWS 849, Hardiman testified that he attended a meeting with Defendant and D'Alessandro of Lanzo Lining, and that a conflict arose between Defendant and Lanzo Lining regarding which subcontractor would be responsible for which line items to be performed under the contract. Defendant identified line items that he wanted to perform, and D'Alessandro was concerned that Lanzo Lining would have no work. Hardiman testified that he told them that it did not matter to him who did the work, but that if he had to choose, he would choose Defendant because two prior Lakeshore contracts that Defendant was not a part of had been canceled and the one Lakeshore contract that Defendant was a part of had been approved. Hardiman testified that everyone eventually agreed that Lanzo Lining would do the bulk of the work under the contract and that Lakeshore wold give Defendant one million dollars for no work. *See* Dkt. # 352, Pg ID 8137-41. Defense Counsel cross examined Hardiman over several days. *See* Dkt. # 353, Pg ID 8223-314; Dkt. # 354, Pg ID 8326-470; Dkt. # 355, Pg ID 8476-557; Dkt. # 356, Pg

ID 8605-26. Further, testimony from Avinash Rachmale, another Lakeshore executive, and text messages between Defendant and Derrick Miller on the date of the above-referenced meeting confirmed Hardiman's testimony. *See* Dkt. # 356, Pg ID 8674-708; Dkt. # 357, Pg ID 8744; Gov't's Exh. LS2-2.

Defendant's undeveloped confrontation clause argument is simply that had Defense Counsel called or subpoenaed Oszust, Penrod, Hausmann, and D'Alessandro, who were "responsible for the actual negotiations, bid and process and payment arrangements, [they] could have testified as to their own state of minds (sic), and the actual facts and reasons what (sic) actually transpired . . . ."

After review of the record, the Court finds that the out-of-court statements that Defendant takes issue with were not testimonial and did not implicate the Confrontation Clause. The out-of-court statements made by Oszust, Penrod, Hausmann, and D'Alessandro, discussed above, were made in informal situations and were not made to law enforcement officers. There is simply no indication that the primary purpose of those conversations was to gather evidence for Defendant's prosecution, or that any of these individuals intended their statements to be a substitute for trial testimony. The Sixth Amendment's Confrontation Clause did not prohibit the Government from introducing the statements of Oszust, Penrod, Hausmann, and D'Alessandro at trial. And as previously discussed by this Court and the Sixth Circuit on appeal, the out-of-court statements at issue in this case were admissible.

Furthermore, Defendant cannot demonstrate that Defense Counsel's failure to call or subpoena these individuals was an unreasonable strategic decision because, given the evidence discussed above, there is no indication that testimony from these individuals

would have been favorable to Defendant. After reviewing the arguments and the record, the Court finds that Defense Counsel's decision not to call or subpoena these individuals was strategic and reasonable. Defendant has not met his burden of showing that Defense Counsel's performance was constitutionally deficient in this regard, or that there is a reasonable probability that, but for Defense Counsel's failure to call or subpoena Oszust, Penrod, Hausmann, and/or D'Alessandro, the jury would have returned a different verdict.

### 7. Failure to Raise Sentencing Errors on Appeal

Defendant argues that Defense Counsel was ineffective because she failed to raise sentencing guidelines errors on appeal. Defendant argues that utilizing the $9,654,533 fraud loss figure was erroneous because the Government cannot precisely calculate the "actual loss" to the City of Detroit or DWSD.

Defendant's argument fails because his sentencing guidelines calculation did not depend on any restitution obligation to the City of Detroit or DWSD such that it would be necessary to calculate "actual loss." In its initial judgment, this Court ordered co-defendant Kwame Kilpatrick to pay $4,584,423 in restitution to DWSD. The Sixth Circuit vacated this Court's award of restitution holding that "restitution must be based on the victim's loss rather than the offender's gain." (Dkt. # 570; Pg ID 17107) (internal quotation marks and citation omitted). This holding, however, is inapplicable to Defendant's sentencing guidelines calculation.

Defendant's extortion sentencing guidelines were calculated under U.S.S.G. § 2C1.1(b)(2), which required Defendant's offense level to increase based on "the value of anything obtained or to be obtained by a public official or others acting with a public

official." This covered Defendant's profits on the contracts that Kwame Kilpatrick, a public official, improperly steered to Defendant as part of their extortion scheme.

At the sentencing hearing, the Court found that the probation department had correctly scored a base offense level of 40, which included a 20-point enhancement pursuant to U.S.S.G. § 2B1.1(b)(1), based on a conservative total fraud loss figure of $9,654,553. Defendant's financial records showed profit margins between 10 and 71 percent on any given contract. The probation department took a conservative approach, using a 10 percent figure for each contract, except for those contracts for which Defendant or his companies performed no work, in which case the full revenue amount was used.

The Court took an even more conservative approach and excluded the contracts that were not separately and independently found by the jury. (Dkt. # 493, Pg ID 16278). The Court also adopted the conservative 10 percent figure, which the Court found was supported by Defendant's own financial records. *Id.* at Pg ID 16246-47. That brought the total fraud loss figure down to $6,284,000, which resulted in a lesser 18-point enhancement and a lower base offense level of 38. *Id.* at Pg ID 16278-79. The resulting guideline sentence was 292 to 365 months, and the Court found that the scope of Defendant's criminal activity justified a sentence in that range. *Id.* at Pg ID 16285-86. Nevertheless, the Court sentenced Defendant to a total term of imprisonment of 252 months, below the guideline range. *Id.* at Pg ID 16286.

Defendant has not shown any error in his sentencing guidelines calculation. The Court properly based his sentencing guidelines on the conservative $6,284,000 fraud loss figure representing the estimated profits that Defendant obtained on the contracts underlying Defendant's convictions. Contrary to Defendant's suggestion, his extortion guidelines

calculation was properly based on a conservative estimate of the value of what he obtained, and unlike an award of restitution, Defendant's extortion guidelines calculation did not need to be limited to "actual loss" to the City of Detroit or DWSD. The Court concludes that Defendant cannot show that Defense Counsel's performance was constitutionally deficient for failure to raise sentencing guidelines errors on appeal because such a claim would have been without merit.

### D. Prosecutorial Misconduct

Defendant argues that his convictions must be vacated because several instances of alleged prosecutorial misconduct rendered his trial fundamentally unfair. Specifically, Defendant takes issue with: (1) the Government's closing argument regarding Contract CM 2014; (2) the Government's closing argument regarding Contract CS 1368; (3) the Government's closing argument regarding Amendment Four to Contract CS 1368; (4) the Government's reliance on Bernard Parker, III's testimony during closing argument regarding Contract PC 748 and Contract PC 755; (5) the Government's closing argument regarding Contract DWS 849; (6) the Government's introduction of Exhibit LS3-36; (7) the Government's closing argument regarding the Kilpatrick Civic Fund; (8) the Government allegedly misleading the Court regarding a prior conviction during the sentencing hearing; and (9) the Government improperly arguing for an obstruction of justice sentence enhancement at sentencing.

To warrant vacating a sentence based on a claim of prosecutorial misconduct, the conduct complained of must be "so egregious so as to render the entire trial fundamentally unfair." *Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir. 1997) (internal quotation marks omitted). The court must decide whether the prosecutor's misconduct likely had a bearing

on the outcome of the trial in light of the strength of the competent proof of guilt. *Id.* The court must apply the harmless error standard and examine the fairness of the trial, not the culpability of the prosecutor. *Id.*

### 1. Contract CM 2014

During closing argument, the Government argued that Defendant's team's bid on Contract CM 2014 was $1.6 million higher than a rival bid. (Dkt. # 406, Pg ID 14452-53). Defendant claims that the Government blatantly disregarded the facts presented at trial because Lakeshore was awarded this contract, not Defendant. However, the evidence at trial showed that Defendant introduced Lakeshore to subcontractor E & T Trucking; that E & T Trucking was a Ferguson affiliated company; that Lakeshore partnered with E & T Trucking on their bid understanding E & T Trucking to be a Ferguson affiliated company; that Lakeshore's bid proposal misrepresented FEI's work experience as that of E & T Trucking; and that Defendant received over $4 million from the award of this contract to Lakeshore. *See* Dkt. # 352, Pg ID 8170-73; Dkt. # 357, Pg ID 8772-77; Gov't's Exh. BFF-31; Dkt. # 367, Pg ID 9643-44.

### 2. Contract CS 1368

During closing argument, the Government stated that Anthony Soave found out that Kwame Kilpatrick was holding on to Contract CS 1368, and that Kathleen McCann testified that this contract was stuck in the mayor's office. (Dkt. # 406, Pg ID 14481-82). Defendant claims that the Government misrepresented their testimony. However, Soave testified that he scheduled a meeting with Kwame Kilpatrick during which Soave asked Kilpatrick what the hold up was on this contract. (Dkt. # 370, Pg ID 10035-36). Kilpatrick responded that

Soave had the wrong subcontractor, and that Defendant was the right one. *Id.* at Pg ID 10036. McCann then testified that DWSD had recommended that this contract be approved but that it became stuck at the mayor's office. (Dkt. # 372, Pg ID 10282, 10291).

### 3. Amendment Four to Contract CS 1368

During closing argument, the Government stated that Amendment Four to Contract CS 1368 was approved only after Inland agreed to make a payment to Defendant of $350,000 for nothing. (Dkt. # 406, Pg ID 14484). Defendant claims that there was absolutely no evidence to support this statement. However, McCann testified that she received two e-mails from Oszust indicating that Amendment Four to Contract CS 1368 was being held up by Kwame Kilpatrick and his administration until Ferguson Enterprises was satisfied. *See* Dkt. # 372, Pg ID 10325-27; Gov't's Exh. IN1-47; Gov't's Exh. IN1-50. Derrick Miller testified that Defendant wanted more money from Inland for work on the sewer collapse, and that this contract was being held up until Inland paid Defendant. *See* Dkt. # 386, Pg ID 12210. Bernard Parker, III testified that Defendant told him that this contract would not move unless he got more money on this contract. *See* Dkt. # 379, Pg ID 11153-54. Despite the fact that DWSD sent this contract to the mayor's office for approval in August 2005, it was not signed by the mayor until December 23, 2005 — after Defendant's dispute with Inland was resolved. *See* Dkt. # 372, Pg ID 10319, 10323-31; Dkt. # 379, Pg ID 11153-57, 11162-66; Dkt. # 386, Pg ID 12209-17; Gov't's Exh. IN1-55.

### 4. Bernard Parker, III's Testimony Regarding Contracts PC 748 and PC 755

During closing argument, the Government referred to testimony from Bernard Parker, III regarding Contracts PC 748 and PC 755. Defendant maintains that the Government improperly recounted Parker's hearsay testimony. However, as discussed above, Parker's

testimony was properly admitted, and Defendant presents no developed argument to the contrary.

### 5. Contract DWS 849

During closing argument, the Government stated that Defendant was paid $1.7 million on Contract DWS 849 for no work. (Dkt. # 406, Pg ID 14453). Defendant maintains that this was an improper insinuation because the $1.7 million was a legitimate settlement of a contract dispute between Defendant and other subcontractors on the bid. However, as discussed above, the evidence at trial showed that Lakeshore agreed to give Defendant one million dollars for no work because two prior Lakeshore contracts that Defendant was not a part of had been canceled and the one Lakeshore contract that Defendant was a part of had been approved. *See* Dkt. # 352, Pg ID 8137-41; Dkt. # 356, Pg ID 8674-708; Dkt. # 357, Pg ID 8744; Gov't Exh. LS2-2.

### 6. Government's Exhibit LS3-36

Defendant asserts that the Government fabricated Exhibit LS3-36, a chart representing the rankings for the bid proposals received by DWSD for Contract CM 2014. Defendant takes issue with the fact that "FEI" appears next to "Lakeshore" on the chart because subcontractor E & T Trucking was a part of the Lakeshore bid proposal for this contract, not FEI. However, as discussed above, the evidence at trial showed that Defendant introduced Lakeshore to E & T Trucking; that E & T Trucking was a Ferguson affiliated company; that Lakeshore partnered with E & T Trucking on their bid understanding E & T Trucking to be a Ferguson affiliated company; that Lakeshore's bid

proposal misrepresented FEI's work experience as that of E & T Trucking; and that Defendant received over $4 million from the award of this contract to Lakeshore. *See* Dkt. # 352, Pg ID 8170-73; Dkt. # 357, Pg ID 8772-77; Gov't's Exh. BFF-31; Dkt. # 367, Pg ID 9643-44. Defendant also asserts that Exhibit LS3-36 is misleading because the average-cost method of ranking the bids was used prior to the City of Detroit Human Right's Department revoking the Detroit-Headquartered Business ("DHB") certification of DLZ, a subcontractor partnered with a higher-ranked rival bidder. This, however, is exactly what the Government's chart depicts. Exhibit LS3-36 clearly indicates that the average-cost method was used prior to the DHB certification being revoked.

### 7. Kilpatrick Civic Fund

During closing argument, the Government argued that Defendant was sharing the spoils of Kilpatrick Incorporated with a coconspirator when he put $75,000 in the Kilpatrick Civic Fund as it was winding down. (Dkt. # 406, Pg ID 14461). Defendant argues that this was improper because there was no evidence at trial other than the check from FEI to the Civic Fund. However, the evidence at trial also included a significant amount of testimony and exhibits regarding the relationship between Defendant and Kwame Kilpatrick, the time of payment, the actions Kwame Kilpatrick took to ensure that Defendant received lucrative contracts, and the personal uses to which Kwame Kilpatrick put the Civic Fund that did not correspond to the stated purposes of the Civic Fund.

### 8. Prior Conviction

Defendant pled guilty to Assault with Intent to do Great Bodily Harm Less than Murder in 2004. During the sentencing hearing, the Government referred to Defendant's prior conviction: "[H]e decided that he suspected an employee was calling his wife. He handled

29

that with the end of a pistol. That man is still suffering brain damage." (Dkt. # 493, Pg ID 16268). The Court found that Defendant had "a history of hotheadedness with a conviction for pistol whipping and seriously injuring an employee." *Id.* at Pg ID 16283. Defendant asserts that the prosecutor's "flagrant prejudicial statements" regarding his prior conviction improperly influenced the Court and resulted in an unduly harsh sentence. However, Defendant does not dispute that he was convicted for this conduct. And again, the Court ultimately sentenced Defendant below the guideline range.

### 9. Obstruction of Justice

Defendant received a two-point enhancement for obstruction of justice. Defendant claims that there was no evidence presented at trial to show that he obstructed justice. However, as the Court indicated during the sentencing hearing, the evidence at trial included ample testimony with respect to Defendant threatening his mistress and her sisters that harm would come their way if they did not falsify their testimony to a grand jury investigating campaign finance issues. (Dkt. # 493, Pg ID 16250, 16281). Additionally, the Court found that Defendant submitted false exhibits to the Court for trial in an attempt to distort the start time of his work on the Sterling Heights sinkhole, as well as misrepresented his financial condition to the Court when he argued that he should not be detained pending sentencing. *Id.* at 16282.

After review of the record, the Court concludes that Defendant cannot establish that any prosecutorial misconduct likely had a bearing on the outcome of the trial in light of the strong and competent proof of Defendant's guilt.

### E. Insufficiency of the Evidence

Lastly, Defendant argues that his convictions must be vacated because the evidence at trial was not sufficient to sustain his convictions. The Government responds that Defendant's arguments consist of large excerpts of trial transcript followed by Defendant's own spin on the evidence, which in no way demonstrates insufficiency of the evidence. This Court agrees. The jury rejected Defendant's interpretation of the evidence, and this has Court already addressed the sufficiency of the evidence for each of Defendant's convictions at length. *See* Dkt. # 462.

Based on the above analysis, the Court finds that Defendant failed to show improper jury instructions. Defendant also failed to show that Defense Counsel's performance was deficient and/or prejudiced the defense under the *Strickland* test. The Court further finds that Defendant failed to show any prosecutorial misconduct. Defendant also failed to show insufficiency of the evidence. Additionally, Defendant procedurally defaulted the majority of his claims. Defendant is not entitled to relief under 28 U.S.C. § 2255.

## III. CERTIFICATE OF APPEALABILITY

Federal Rule of Appellate Procedure 22 provides that an appeal may not proceed unless a certificate of appealability is issued under 28 U.S.C. § 2253. Rule 11 of the Rules Governing Section 2254 and 2255 Proceedings requires that a district court must "issue or deny a certificate of appealability when it enters a final order adverse to the applicant . . . . If the court issues a certificate, the court must state the specific issue or issues that satisfy the showing required by 28 U.S.C. § 2253(c)(2)."

A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A court must either issue a certificate of appealability indicating which issues satisfy the required showing or provide reasons why such a certificate should not issue. 28 U.S.C. § 2253(c)(3); Fed. R. App. P. 22(b); *In re Certificates of Appealability*, 106 F.3d 1306, 1307 (6th Cir.1997). To receive a certificate of appealability, "a petitioner must show that reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." *Miller–El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citations omitted).

For the reasons stated in this opinion, the Court will deny Defendant a certificate of appealability because he has failed to make a substantial showing that his due process rights were compromised.

## IV. CONCLUSION

Based upon the foregoing, IT IS ORDERED that the petition for post-conviction relief is DENIED WITH PREJUDICE. IT IS FURTHER ORDERED that a certificate of appealability is DENIED.

SO ORDERED.

S/Nancy G. Edmunds
Nancy G. Edmunds

United States District Judge

Dated:  February 27, 2018

I hereby certify that a copy of the foregoing document was served upon counsel of record on February 27, 2018, by electronic and/or ordinary mail.

S/Lisa Bartlett
Case Manager